# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JEROME MCKINNEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. 15-1538** |
| ) | |
| **UNIVERSITY OF PITTSBURGH,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>Memorandum Opinion</u>

Pending before the court are the cross-motions for summary judgment filed by plaintiff

Jerome McKinney ("Plaintiff" or "Dr. McKinney") (Docket No. 24) and defendant University of

Pittsburgh ("Defendant" or "the University") (Docket No. 20).

Count I of Dr. McKinney's Complaint alleges that the University discriminated against

him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"),

based on his race when: (1) his salary was cut by 20% in 2013; (2) his salary was increased by a

substantially smaller percentage than the average salary increase of his Caucasian counterparts

between 2006 and 2013; (3) he was excluded from certain committees, including the Ph.D.

Planning and Testing Committee, despite his seniority and expertise; (4) he was subjected to

harassing oversi[ght] not applied to other faculty members; and (5) he was prevented from

teaching courses which he had taught in the past. (Docket No. 1 at 25). Count II of Dr.

McKinney's Complaint alleges that the University violated his procedural due process rights

when it did not provide him with any substantive process to defend himself prior to the

University reducing his salary. *Id.* at ¶ 27.

Dr. McKinney has filed a Motion for Summary Judgment as to Count II of his Complaint. (Docket No. 24). In support of his motion, he has filed a brief (Docket No. 25), a concise statement of undisputed material facts ("Plaintiff's Concise Statement of Undisputed Material Facts") (Docket No. 26), an appendix with exhibits (Docket No. 27), and a reply to defendant's response (Docket No. 35).

In response to Dr. McKinney's Motion for Summary Judgment, the University filed a memorandum of law in opposition (Docket No. 31), a counter statement of material facts (Docket No. 32), and an appendix of record evidence (Docket No. 33).

The University has filed a Motion for Summary Judgment as to both Counts I and II of Dr. McKinney's Complaint. (Docket No. 20). In support of its motion, the University filed a memorandum of law (Docket No. 21), a concise statement of undisputed material facts ("Defendant's Concise Statement of Undisputed Material Facts") (Docket No. 22), an appendix of record evidence with exhibits (Docket No. 23), and a reply brief (Docket No. 37).

In response to the University's motion, Dr. McKinney filed a response in opposition (Docket No. 28), a brief in opposition (Docket No. 29), a response to defendant's concise statement of undisputed material facts (Docket No. 30), and a sur-reply in opposition (Docket No. 38).

A hearing on the cross-motions for summary judgment was held on February 24, 2017 (Docket No. 39), and the transcript of the hearing filed (Docket No. 40). This matter, thus, is fully briefed, argued, and ripe for disposition. As more fully explained below, Plaintiff's motion for summary judgment will be granted as to Count II of the Complaint, and Defendant's motion for summary judgment will be denied as to Count II of the Complaint and granted as to Count I of the Complaint.

**I. Standard of Review.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The parties must support their respective position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505 (1986). "When confronted with cross-motions for summary judgment, the '"court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard"." *Anderson v. Franklin Institute*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting *Schlegel v. Life Ins. Co. of N. America*, 269 F.Supp.2d 612, 615 n. 1 (E.D. Pa. 2003); Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir.

1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587; *Huston*, 568 F.3d at 104.

## II. Relevant Facts.

Following is a recitation of the facts relevant to the parties' cross-motions for summary judgment as to Count II of Plaintiff's Complaint.[1] Where the parties agree that a fact is undisputed and relevant, the Court will cite to the relevant page and paragraph in the parties' statements of undisputed material facts (Docket Nos. 22 and 26). Where a party disputes a fact alleged by the other party, the court will cite to the specific evidence of record that supports the fact in question. Additionally, the Court has quoted directly from two letters sent to Dr. McKinney from the University even though the contents of the letters are not in dispute, a letter dated August 3, 2012, and a letter dated August 20, 2013.

The University is a state-related institution of higher learning located in Pittsburgh, Pennsylvania. (Docket No. 26 at ¶ 2). Dr. McKinney has been continuously employed by Defendant since September of 1970 in the Graduate School of Public and International Affairs ("GSPIA") . (*Id.* at ¶¶ 3 and 6). Dr. McKinney currently is a full, tenured professor at the University. (*Id.* at ¶ 4). The University granted Dr. McKinney tenure in 1974 and he was promoted to full professor in 1987. (Docket No. 22 at ¶ 2). The rights of the University and faculty members regarding the termination of tenured faculty members is set forth in University

---

[1] As explained in greater detail *infra*., Plaintiff agrees that Defendant's Motion for Summary Judgment as to Count I of his Complaint, his race discrimination claim, should be granted. *See infra*. at 16. Accordingly, it is unnecessary to discuss the evidence of record relevant to Count I of the Complaint.

of Pittsburgh Policy 02-02-07 ("Policy 02-02-07"). (Docket No. 27-20 at 1). In particular, Policy 02-02-07 states: "Termination of any appointment, other than by expiration of term, may be made for cause." (*Id.*)

John Keeler ("Dean Keeler") has held the position of Dean at GSPIA since 2007. (Docket No. 26 at ¶ 10). The Deans of each of the schools contained within the University, including the Dean of the GSPIA, report to the Office of the Provost. (*Id.* at ¶ 8). Patricia Beeson ("Provost Beeson") has held the position of Provost for the University since 2010. (Id. at ¶ 9).

All faculty at the University are evaluated on three main criteria: (1) their teaching record; (2) their research and scholarship achievements; and (3) their service to the University and/or community. (Docket No. 22 at ¶ 7). At the conclusion of each academic year, faculty within the GSPIA are expected to provide to Dean Keeler a summary of their achievements for the year in the form of a Faculty Activity Report ("FAR"), which provides information on each of the three criteria listed above. (*Id*. at ¶ 8). Within the GSPIA, faculty submit their annual FARs, updated CVs and any publications from the past year to the Dean's secretary, who in turn provides them to the school's Merit Review Committee ("the MRC"). (*Id.* at ¶ 9).

Annual performance reviews at the GSPIA are performed, in part, by the MRC, which is comprised of three (3) GSPIA faculty members, which are selected annually by vote of all faculty of the GSPIA. (Docket No. 26 at ¶ 38). The MRC rates each professor's accomplishments (other than themselves) in the three categories of interest on a scale of 1 to 10: (1) teaching; (2) research/publication; and (3) university/ community service. (*Id.* at ¶ 39; Docket No. 22 at ¶ 11). The Dean is then provided with the mean of the three MRC assessments for each faculty member to be used in his annual performance reviews of the faculty. (Docket No. 22 at ¶ 12). The MRC's assessments and ranking are only advisory to the Dean; Dean Keeler

also makes his own independent evaluation of the professor's performance in the three categories. (*Id*. at ¶ 13; Docket No. 26 at ¶ 40). Additionally, at the conclusion of every semester, Dean Keeler and each individual professor is given a report from the University's Office of Measurement and Evaluation of Teaching ("OMET") indicating how students evaluated their professors' teaching that semester. (Docket No. 22 at ¶ 15).

Once Dean Keeler reviews the MRC's scores and rankings, the Dean determines how to allocate the salary pool provided by the Provost's Office for GSPIA faculty members. (*Id*. at ¶ 14). Professors then are informed of the findings of the MRC, Dean Keeler's personal evaluation of their performance, and their salary determinations, by letter from Dean Keeler. (Docket No. 26 at ¶ 42).

Contained in the Faculty Handbook dated July 2002 (as updated November 2011) is the following information about salary increases:

> **Salary Increases**
> Annual faculty salary increases are determined through procedures outlined in University Policy 07-09-01, *Salary Increase*. The size of the total pool of funds for salary increases is determined as part of the annual operating budget by the Chancellor, with the active participation of the University Planning and Budgeting Committee (UPBC), and subject to approval by the Board of Trustees.
>
> The total pool for salary increases has the following four components: (1) maintenance of real salary, (2) merit increases, (3) equity adjustments, and (4) market adjustments. The portion of the total pool devoted to each of the four components is determined by the Chancellor, with the active participation of the UPBC, in response to needs for each purpose identified through the planning and budgeting system.
>
> For additional information, refer to University Policy 07-09-01, (http://www.cfo.pitt.edu/policies/policy/07/07-09-01.html) *Salary Increase*.

(Docket No. 27-4 at 1 and 86) (emphasis in original).

The University's Policy 07-09-01 ("Policy 07-09-01"), in place during the relevant time period, is titled CATEGORY: PERSONNEL; SECTION: Salary Administration; SUBJECT:

Salary Increase; and EFFECTIVE DATE: September 16, 1994." (Docket No. 27-7). It explains in relevant part:

> Salaries at the time of initial hire are determined primarily by market factors. What follows is a set of policy recommendations to provide a framework governing annual salary increases for faculty and staff, to be applied within the Planning and Budgeting System (PBS).
>
> These recommendations provide some flexibility for particular units, within the context of policy decisions made centrally. The size of the total pool of funds for increases and the allocation of funds to particular responsibility centers are centrally determined. The distribution of funds to individuals within each unit, however, is to a significant degree left to local determination.

(*Id.* at 1). Policy 07-09-01 further states in relevant part under "ALLOCATION OF SALARY INCREASE FUNDS TO RESPONSIBILITY CENTERS" concerning the "Maintenance of Real Salary," that "[e]ach unit will be allocated funds from the total pool to ensure the maintenance of real salary of each faculty or staff member performing satisfactorily." *Id.* It further provides in relevant part under "DISTRIBUTION OF SALARY INCREASES TO INDIVIDUALS WITHIN UNITS," concerning the "Maintenance of Real Salary:"

1. Each faculty or staff member performing satisfactorily will receive a percentage increase of the size determined for that year for maintenance of real salary.

2. For faculty, satisfactory performance is defined as having fulfilled the "common responsibilities" of faculty as articulated in the 1988 Handbook for Faculty: The role of individual faculty members in supporting the mission of the University will depend on the specific missions of their departments or schools. All faculty members, however, have certain common responsibilities: to commit themselves fully to their teaching obligations, to meet all of their classes as scheduled, to be available during specified office hours for consultation with students, to evaluate student performance promptly and fairly, to participate in the development of the programs of their departments and schools and of the University as a whole, to engage in scholarly activities, and, as appropriate, to support the University in its goal to render public service. (p. 42)[.]

Criteria for satisfactory performance may be further specified for particular units, as jointly determined by the faculty and the head of the unit through collegial processes[.]

*(Id.* at 2).  The Policy also states in relevant part under "NOTIFICATION OF SALARY INCREASES:"  "At the time of notification of salary for the coming year, each continuing faculty or staff member will be informed in writing of the basis for his or her individual salary increase.  Persons whose performance has been judged unsatisfactory must be informed of the specific reasons for that judgment." (*Id*. at 3).  The policy further states under "RECONSIDERATION OF SALARY DECISIONS:"  "Procedures should be developed within each responsibility center through which individual faculty and staff members can request reconsideration of decisions related to aspects of their salaries[.]" *Id.*  Both University Provost Patricia Beeson ("Provost Beeson") and Dean Keeler testified at their depositions that although the "subject" of Policy 07-09-01 is titled "Salary Increase," they believed that it is the policy that addresses appeals of salary decisions, including reductions.  (Dockets Nos. 27-5 at 32 and 23-9 at 142-143).

The GSPIA also has a written policy which was in effect during the relevant time period titled "Salary Increase Appeals Procedure for Faculty and Staff."  (Docket No. 27-9 at 1).  This policy states: "Faculty can appeal salary determinations by submitting a formal written appeal.  Faculty appeals of salary will be heard by the elected Merit Review Committee, meeting in committee. The committee will make a formal recommendation, in writing, to the Dean." *Id.*  Dean Keeler explained that this was the policy he supplied to Dr. McKinney after the September 6, 2013 meeting for appealing the salary decision.  (Docket No. 23-9 at 142-143).

With respect to salary reductions, Provost Beeson also explained that "[t]here is nothing written, but I would never let a dean reduce salary without sufficient warning to the individual, that warning being written, and two annual performance reviews and receiving no salary increase before they receive a reduction."  (Docket No. 27-5 at 17).  Provost Beeson further explained

that performance reviews are the responsibility of the deans of the schools and, as provost, she does not verify the performance reviews. (*Id*. at 19-20). The only time there would be an appeal of a salary decision outside of the school in question is if there was an allegation of discrimination, harassment, and/or retaliation. (*Id.* at 29). Otherwise, the final decision rests with the dean of the school in question. (*Id*.).

In approximately March 2008, Dr. McKinney provided his first FAR to Dean Keeler advising on his accomplishments in the areas of teaching, scholarship and service for the 2007-2008 academic year. (Docket No. 22 at ¶ 16). Dr. McKinney's 2007-2008 FAR indicated he taught four courses during fall 2007 and spring 2008 terms and chaired the committees of three Ph.D. students. (*Id*. at ¶ 17). With respect to research and publication, Dr. McKinney listed on his 2007-2008 FAR six books or articles under review for publication and five other submissions that were planned. (*Id*. at ¶ 18). Dr. McKinney also listed several committees and community boards in which he participated in support of his service efforts. (*Id.* at ¶ 19).

Dean Keeler evaluated Dr. McKinney's performance as a GSPIA faculty member based on Dr. McKinney's FAR submission and the evaluation performed by the MRC. (*Id.* at ¶ 16). In a letter to Dr. McKinney dated September 3, 2008, Dean Keeler noted that Dr. McKinney's performance was ranked very low by the MRC (28 out of the 31 GSPIA faculty), and that Dr. McKinney had received a relatively low mean student rating (3.44, 2.93, and 2.64) in the three (3) courses that had been evaluated by 68 students that year. (Docket No. 23-5 at 14). Nevertheless, Dean Keeler credited Dr. McKinney for the "good amount of [research] material in the pipeline" Dr. McKinney listed on his 2008 FAR, and Dr. McKinney received a 3% salary increase following the 2007-2008 academic year. (Docket No. 22 at ¶¶ 22-23).

Dr. McKinney's class enrollments dropped between the fall 2008 and spring 2010 semesters, and his OMET scores based on student satisfaction were below those of his peers. (Docket No. 22 at ¶¶ 25-26). Throughout this period, Dean Keeler offered Dr. McKinney advice and options on how to improve his teaching and enrollment, such as subjecting one or two of his classes to peer review, or visiting the University's CIDDE office, which specializes in assisting faculty with creative teaching techniques. (*Id*. at ¶ 27). Dr. McKinney believed that he did not need any help from the CIDDE. (*Id*. at ¶ 28).

With respect to Dr. McKinney's lack of publications, Dean Keeler initially gave Dr. McKinney the benefit of the doubt that he had considerable material for publication "in the pipeline," which was identified in McKinney's FARs. (*Id*. at ¶ 29).

Dr. McKinney listed several of the same scholarly contributions as "work under review" and "work in progress" on his annual FARs year after year. (*Id.* at ¶ 30). Some of the same works listed on Dr. McKinney's 2010 and 2012 FARs appeared on the FAR he submitted in 2002. (*Id*. at ¶ 31).

Dr. McKinney had submitted the scholarly works that he listed on his FARs to publishers. (Docket No. 23-1 at 64-69). The works had been returned to Dr. McKinney for a variety of reasons (primarily for being too long). (*Id.* at 65 and 67). With respect to the majority of the "returned" works that appeared on his FARS for multiple years, Dr. McKinney had not yet made the necessary changes to have the works published. (*Id.* at 69). With respect to his work, Break-Even Analysis on Public and Nonprofit Agencies, Dr. McKinney had edited it, and sent it back to a publisher, at least two times. (Docket No. 23-2 at 151-152). Dr. McKinney does not have any letters he received from publishers specifying what edits would be needed to effectuate publication for any of the works he listed as "under review" on his FARs. (Docket No. 22 at ¶

33).  When Dr. McKinney was ready to start editing a work, he would call or email the publisher and ask them what they wanted him to do at that point.  (Docket No. 23-2 at 153).

On August 23, 2010, Dr. McKinney received notice from Dean Keeler that his salary for Fiscal Year 2011 would be increased by 2.0%; this was the amount specified for faculty who had performed at a "satisfactory" level.  (Docket No. 26 at ¶ 45).  On August 23, 2011, Dr. McKinney received notice from Dean Keeler that his salary for Fiscal Year 2012 would be increased by 1.5%; this was the amount specified for faculty who had performed at a "satisfactory" level (*Id*. at ¶ 46).

None of the scholarly works listed on Dr. McKinney's 2008-2012 FARs were published before Dean Keeler's August 2012 annual review.  (Docket No. 22 at ¶ 34).  On August 30, 2012, Dr. McKinney received a letter from Dean Keeler that his salary for the academic year 2012-2013 would be increased by 0.5%.  (Docket No. 26 at ¶ 47).  In the letter, Dean Keeler informed Dr. McKinney that his performance was "less than satisfactory," explained with particularity how Dr. McKinney's performance  was lacking, and concluded: "[p]lease note that if your performance does not improve next year (performance includes not just your record of teaching, research and service but also  making sure course evaluations are completed, demonstrating an effort to improve your teaching through obtaining peer reviews, reporting your publications on your CV in a clear and complete fashion, and turning in copies of materials listed as in the pipeline) I will have no recourse but to give you a 0.0% raise or even consider a salary reduction."  (Docket No. 27-12 at 1-3).  With respect to Dr. McKinney's lack of publication, Dean Keeler noted in the letter, and Dr. McKinney admitted, as of August 2012, Dr. McKinney's last chapter in an edited book had been published in 2003, and his last refereed journal article had been published in 1987, twenty-five (25) years previously.  (Docket No. 22 at ¶ 36, Docket

No. 27-12 at 2). The significance of publishing a "refereed journal article" is that an author's scholarly work, research, or ideas are subjected to the scrutiny of others who are experts in the same field, before a paper describing this work is published in a journal. (Docket No. 22 at ¶ 37). Dean Keeler also explained that the MRC had ranked Dr. McKinney 26 out of 26 core faculty members. (*Id.* at ¶ 39).

With respect to the 2012-2013 academic year, Dr. McKinney was once again ranked last by the MRC. (*Id.* at ¶ 48). Dr. McKinney only taught three courses that year, and all of his 17 students were solicited to provide OMET evaluations of McKinney's teaching performance; Dr. McKinney received a mean student rating of 3.3, the lowest rating among all core GSPIA faculty. (*Id.* at ¶¶ 49-50). In one of his three courses, 75% of McKinney's students responded that they would "definitely not" recommend him as an instructor to other students. (*Id.* at ¶ 51). Additionally, one of McKinney's four courses had to be canceled after only one student appeared at the first meeting, enrollments in his other courses remained significantly lower than those taught by his peers, and several students dropped out of his courses after the first week. (*Id.* at ¶ 52).

Dr. McKinney had only one of his courses peer reviewed by a fellow full professor during the 2012-2013 school year, Dr. Louise Comfort, even though Dean Keeler had expressly instructed Dr. McKinney in the prior year's evaluation letter that he was to arrange for a peer review of one course each semester, including an undergraduate course, to demonstrate that he was using the feedback provided to him to improve his teaching record. (*Id.* at ¶¶ 53-54). Dr. McKinney also did not provide Dean Keeler with a manuscript for any of the eight publications he listed on his 2013 FAR as "in progress" as Dean Keeler had requested. (*Id.* at ¶¶ 56 and 71). Dr. McKinney did provide Dean Keeler with a manuscript concerning military purchasing.

(Docket No. 23-3 at 171-172).  Dr. McKinney also reported that his updated edition to a 2004 textbook was in the publication process, but when Dean Keeler asked to see a copy of the manuscript, he was informed by Dr. McKinney that he had only completed one chapter and was unwilling to share even that with Dean Keeler.  (Docket No. 22 at ¶ 57).  Dr. McKinney also failed to make the requested revisions to his CV in 2013 to accurately reflect his research and publication record as expressly requested by Dean Keeler.  (*Id.* at ¶ 58).

By letter dated August 3, 2013,  Dean Keeler informed Dr. McKinney that effective September 1, 2013, he would be receiving a salary reduction of 20% for the academic year 2013-2014, explaining "[i]n light of the rating of your performance by the Faculty Merit Review Committee and my own assessment, you will not receive a raise this year.  In fact, since you failed to improve on the record that was deemed unsatisfactory last year, and since new information now makes it apparent that you have been inaccurately reporting progress on research for some years, I regret to say that you are to receive a salary reduction of 20%." (Docket No. 27-13 at 1). The letter further provided:

> You will recall that in my merit assessment letter last year I stated that "if your performance does not improve next year (performance includes not just your record of teaching, research and service but also making sure course evaluations are completed, demonstrating an effort to improve your teaching through obtaining peer reviews, reporting your publications on your CV in a clear and complete fashion, and turning in copies of materials listed as in the pipeline) I will have no recourse but to give you a 0.0% raise or even consider a salary reduction." It is very clear that your performance did not improve this year; indeed, it is more unsatisfactory than last year by many measures.  Moreover, in light of additional information that you were required to provide this year, it is impossible not to conclude that you have been overstating your record in one important area-research-for at least the past several years. What that means is that both the Merit Review Committee and I have been giving you too much credit in the research category for the past several years, and that we would have judged your performance more negatively if we had been provided with accurate information. Given these facts, you have left me with no choice but to impose a substantial salary reduction.

(*Id.* at 1-2).  The letter then continued on to detail the bases for Dean Keeler's decision and

concluded:

> In conclusion, your performance for this past year in both the teaching and
> research categories was highly unsatisfactory, as the salary reduction indicates.  In
> both categories, your performance was far below the norm for a full professor at
> GSPIA and, more broadly, at the University of Pittsburgh.  In 2013-14 you must
> thus do the following things to indicate that you are working in a professional
> manner to improve your performance:  1) arrange for peer reviews of at least one
> course each semester, including one undergraduate  course; 2) contact CIDDE and
> arrange to work with a consultant on ways to improve your teaching; 3) do
> everything possible to increase enrollments in your courses-including producing
> more professional syllabi in line with the suggestions of Prof. Comfort (you must
> provide me with a copy of all of your syllabi at the beginning of each term) and
> arriving ahead of time for your classes so as to avoid losing enrolled students; 4)
> write and submit to a refereed journal at least one article manuscript; 5) carefully
> follow the instructions for each section of the FAR and list items under section II
> accurately and fully; 6) turn in manuscripts, with your 2014 FAR, of any items
> listed under section IIB-C.
>
> **If you fail to do the things listed in the paragraph above and show no
> improvement in your record next year, I will be compelled to reduce your
> salary again or even consider more serious action.**

(*Id.* at 2-5) (emphasis in original).  Dr. McKinney believed Dean Keeler's recommendations

were degrading, and he told Dean Keeler that his representations about works in progress should

be accepted on faith.  (Docket No. 22 at ¶ 62).

Dean Keeler and Dr. McKinney met on September 6, 2013; it was at this meeting that Dr.

McKinney was given the August 3, 2013 letter and told about the 20% reduction in salary.  (*Id.*

at ¶ 64; Docket No. 27-3 at 188).  After the meeting, on September 6, 2013, Dean Keeler advised

Dr. McKinney via e-mail of the process within the GSPIA for appealing a salary decision.

(Docket No. 22 at ¶ 64).  GSPIA's "Salary Increase Appeals Procedure for Faculty and Staff"

states in relevant part:

> Salary increases for faculty and staff will be based on individual performance
> (meritorious,  satisfactory,  or  unsatisfactory)  and  other  factors  relating  to  the

market, equity, and compression. Appeals or requests for reconsideration of salary increases must be in writing and have at least one of the above factors as the basis for requesting reconsideration.

**FACULTY**
Faculty can appeal salary determinations by submitting a formal written appeal. Faculty appeals of salary will be heard by the elected Merit Review Committee, meeting in committee. The committee will make a formal recommendation, in writing, to the Dean.

. . .

**FINAL REVIEW**
For both faculty and staff appeals, the final appeal within the school rests with the dean. Appeals to the Provost's office are limited to cases where the individual is alleging discrimination or retaliation.

(Docket No. 27-9) (emphasis in original). Dr. McKinney did not appeal Dean Keeler's salary decision within the GSPIA. (*Id.* at ¶ 65). Instead, in a letter addressed to Provost Beeson, dated September 11, 2013, Dr. McKinney informed the provost that Dean Keeler had reduced his salary by 20% and that his understanding of Dean Keeler's stated rationale for the reduction was that Dr. McKinney "did not provide him with copies of publications I am currently pursuing and my classes have been too small and my student ratings have been lower than he would like."

(Docket No. 27-14 at 1). Dr. McKinney further stated in the letter:

This is particularly intimidating because he knows I have a contract with Praeger Publishers and I am writing the 4th edition of my Public Sector Financial Text which is one of the most widely used in the field (to be delivered in January), writing two book publications on sustainability, rewriting two articles previously submitted to publishers with a colleague from Mexico, refining an article on accountability in government contracting with a colleague from a U.S. university and recently completed proposals to establish a new university in Saudi Arabia which has been accepted by the Saudi Arabian King whose council is considering when to initiate its development. This university will contain several schools patterned on Pitt's model including: Engineering, Nursing, Health and Rehabilitation and Business. Also, recently the Dean sat in on a luncheon presentation on the methodology for my sustainability book.

(*Id.*)  Dr. McKinney further concluded in his letter to Provost Beeson that "[b]ased on everything I have been experiencing, I am convinced that Dean Keeler has been mobilizing great efforts to separate me from the school.  Possible motives I see are race/and or age."  (*Id.* at 3).

Dr. McKinney's letter was forwarded to Carol Mohamed of the University's Office of Affirmative Action, Diversity and Inclusion.  (Docket No. 26 at ¶ 54).  On or about November 7, 2013, Dr. McKinney and Ms. Mohamed met to discuss the allegations contained in his letter to Provost Beeson and Ms. Mohamed then investigated Dr. McKinney's assertions of racial discrimination. (*Id.* at ¶ 55).

By letter to Dr. McKinney dated February 27, 2014, Ms. Mohamed reported her findings that none of the complaints lodged by Dr. McKinney were the result of his race. (Docket No. 27-15 at 1-2).  With respect to the 20% salary reduction, Ms. Mohamed explained:

> My investigation uncovered that salary reductions have been proposed and, in some cases imposed on other faculty at the University of Pittsburgh. In at least one case I found that the faculty member made a decision to resign or retire prior to such salary reduction being imposed. I found at least one other situation where the reduction was enacted. In both of these cases the faculty member in question was a non-minority. On the issue of being warned in advance, I found evidence of a warning in your performance assessment letter of August 30, 2012. It states on the last page that should you not make specifically detailed improvements in your performance, such as better overall student evaluations and the demonstration of research results in accredited publications, etc., you would be subjected to a, "0.0 % raise or even...a salary reduction." And while I did not find a detailed GSPIA policy on salary reductions, I did find that where written policies and procedures exist within other academic units under the jurisdiction of the University's Office of the Provost those standards may be used as guidance in other schools/ departments. The Office of the Provost confirmed for me that when asked about faculty salary reductions, the advice they provide is, "up to 20%," in a given academic year.

(*Id.* at 2-3).  Dr. McKinney and Ms. Mohamed met on February 27, 2014 to discuss her findings and Dr. McKinney raised some additional concerns.  (Docket No. 27-16 at 1).  By letter dated May 5, 2014, Ms. Mohamed addressed those concerns and stated: "[a]s stated in the February 27,

2014 response, I was not able to conclude that any University of Pittsburgh policies, procedures or operating guidelines have been violated in the matters resulting in your Fall 2013 performance assessment and salary reduction." (*Id.* at 1-2).

### III. Legal Analysis of Defendant's Motion for Summary Judgment.

#### A. Count I- Dr. McKinney's race discrimination claim.

In support of its motion as to Count I of Plaintiff's Complaint, Dr. McKinney's race discrimination claim, the University argues that it is entitled to summary judgment on the claim because Dr. McKinney "cannot show the University's actions in addressing his poor performance were a pretext for unlawful race discrimination." (Docket No. 21 at 2).

In response, Dr. McKinney concedes "that his Title VII claim cannot survive summary judgment." (Docket No. 29 at 2).

In light of Plaintiff's concession that his Title VII claim cannot survive summary judgment, Defendant's motion for summary judgment on Count I of Plaintiff's Complaint shall be granted.

#### B. Count II- Dr. McKinney's procedural due process claim.

Count II of Plaintiff's Complaint contains a claim that the University violated Plaintiff's procedural due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. "As the Third Circuit has explained, [t]o prevail on a procedural due process claim, a litigant must show (1) that the state deprived him of a protected interest in life, liberty, or property and (2) that the deprivation occurred without due process of law." *Corr v. Springdale Borough*, --- F. Supp. 3d --, 2016 WL 6901327, at *2 (W.D. Pa. Nov. 22, 2016) (internal quotations and citations omitted). "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law . . . . " *Bd. Of Regents of State College v. Roth*, 408 U.S. 564, 576 (1972). Importantly, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893 (1976) (internal quotation marks and citation omitted). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593 (1972).

In support of its motion as to Count II of the Complaint, Dr. McKinney's procedural due process claim, the University first contends that summary judgment should be entered in its favor because Dr. McKinney does not have a constitutionally protected interest in any set salary for his tenured faculty appointment. (Docket No. 21 at 16-17) (*citing Vatner v. Bd. of Trustees of the Univ. of Med.*, CIV.A. NO. 12-3339 JLL M, 2015 WL 461901 (D.N.J. Feb. 4, 2105) and *Williams v. Texas Tech. Univ. Health Sciences Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993)). Second, the University argues that if Dr. McKinney has a constitutionally protected interest in any set salary, summary judgment still should be entered in its favor because through: (1) Dean Keeler's 2012 letter to Dr. McKinney explaining the deficiencies in Plaintiff's job performance and what Plaintiff needed to do or risk receiving no pay increase or a pay reduction; (2) Dean Keeler's August 3, 2013 letter to Dr. McKinney explaining Plaintiff's continued performance deficiencies and Dean Keeler's resulting decision to reduce Plaintiff's salary by 20%; (3) Dean Keeler's meeting with Dr. McKinney on September 6, 2013 wherein Dean Keeler advised Dr. McKinney of the reduction in his salary; (4) the subsequent email sent from Dean Keeler to Dr. McKinney explaining the process with the GSPIA for appealing a salary decision; and (5) the University's

Office of Affirmative Action, Diversity and Inclusion's investigation once Dr. McKinney complained to the Provost that Dean Keeler's decision to reduce Plaintiff's salary was based on Plaintiff's race, Dr. McKinney was provided with sufficient notice and opportunity to be heard so that his right to procedural due process was not violated. (*Id.* at 18-19).

To the contrary, Plaintiff argues in support of his motion for summary judgment on his procedural due process claim that "[a]s a public employee, Plaintiff's property rights to his employment are created by Defendant's tenure system, policies, and bylaws" and "Plaintiff in the instant case must have a property right to his salary, as Defendant's policies and bylaws related to tenured professors require a showing of 'unsatisfactory' performance in order to reduce a salary." (Docket No. 25 at 5-6) (citing University's Policies 07-09-01 and 02-02-07), Plaintiff further argues that he was deprived of adequate due process when his salary was reduced in that (1) he was not provided a hearing with an impartial decision maker; (2) "Defendant had neither a pre-deprivation nor post-deprivation hearing process to address salary reductions against tenured professors, such as Plaintiff;" and (3) "Plaintiff has rightfully exhausted all possible avenues of redress internal to Defendant." (*Id.* at 10-12). With respect to his exhaustion of all possible avenues of internal redress, Dr. McKinney further contends that Defendant's employee handbook specifically states how to file a "grievance" in that "[t]he first step is to request an informal mediation through the Senate Tenure and Academic Freedom Committee" and "[t]he second step is to file a formal written complaint with the Provost," but that "[t]his process is both unavailable and inadequate, as the policy states that the definition of a 'grievance' does not include 1) negative evaluations of an individual faculty member's professional work; and 2) dissatisfaction with salary decisions, except where a salary decision, or

set of salary decisions, is part of a pattern of conduct that as a whole rises to the level of

grievance." (*Id*. at 12) (citing Docket No. 27-4 at 39). Plaintiff further explains:

> [w]hile it is inarguable that Plaintiff believes that the decision to cut his salary
> does rise to the level of "grievance," it must be also be noted that the Ad Hoc
> Committee [of the University of Pittsburgh Faculty Senate Regarding "Current
> Guidelines for Evaluating Tenured Faculty and Associated Salary Decisions"]
> reported that "faculty are discouraged from filing a grievance with TAFC or any
> other Standing Committee of the Faculty Assembly because salary dispute has
> been specified by administration as outside the purview of such committees."

(*Id.* at 13) (quoting Docket No. 27-8 at 4). Finally, Plaintiff indicates that he did file a formal

complaint with the Office of the Provost, which was transmitted to the Provost, and that in the

complaint, he disputed Dean Keeler's assessment of his performance and raised concerns about

racial diversity and the treatment of minorities at GSPIA, but that "no investigation or hearing

was ever held on his complaints regarding the accuracy of his performance assessment, or the

appropriateness of his salary reduction." (*Id.*).

### 1. Whether Dr. McKinney has a protected property interest in his salary.

Turning first to whether Dr. McKinney has a protected property interest in his salary such

that it could not be reduced by the University without due process being provided to him

consistent with the Fifth and Fourteenth Amendment to the Constitution, it is well established

that property interests are not created by the Constitution, but rather "by existing rules or

understandings that stem from an independent source such as state law-rules or understandings

that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of

Regents v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person

clearly must have more than an abstract need or desire for it. He must have more than a unilateral

expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* Consistent

with these general propositions, as explained in *Williams v. Texas Tech. Univ. Health Sciences

*Ctr.,* 6 F.3d 290 (5th Cir. 1993): "[a]n expectation of employment carries with it some protected

expectations as to a salary. In some situations that expectation can encompass an employee's

entire salary. But the more detailed and conditional the understanding becomes between

employer and employee, the weaker the linkage becomes between those understandings and the

Due Process Clause." *Id.* at 293 (citing *Eguia v. Tompkins*, 756 F.2d 1130, 1138 (5th Cir.1985);

*Orloff v. Cleland*, 708 F.2d 372, 378 (9th Cir.1983); *Mangaroo v. Nelson*, 864 F.2d 1202, 1206–

08 (5th Cir. 1989)).

While the Court could not find any cases directly on point, either in this circuit or any

other federal circuit, several Third Circuit court cases, where the appellate court opined why a

plaintiff had not stated a procedural due process claim, provide the Court with guidance in its

query.   In *Kelly v. Borough of Sayreville, N.J.*, 107 F.3d 1073 (3d Cir. 1997), the appellate court

determined that a police officer who claimed that he had been subjected to reprimands,

disciplinary actions, reprisals and job-related actions by his employer in violation of the

Fourteenth Amendment, but did not claim that he had lost compensation or other employment

benefits by reason of his employers' actions, had failed to state a claim for deprivation of a

property interest in violation of the Fourteenth Amendment.  *Kelly*, 107 F.3d at 1077.  In so

determining, the appellate court distinguished two cases where due process violations had been

found "as they involved interference with employment rights" and further explained "[w]e

reiterate that in contrast the appellees never discharged or demoted [plaintiff,] and he lost no

compensation of other employment benefits by reason of their actions.  Accordingly, the

appellees never deprived [plaintiff] of a property interest in his employment." *Id.*  In *Ferraro v.

City of Long Branch¸* 23 F.3d 803 (3d Cir. 1994), the appellate court determined that the

plaintiff, a career civil service employee, who alleged that his employer had changed his work

assignment but had not changed his job title or modified his salary and benefits, and whose new duties clearly related to the functioning of the department of the entity in which he was employed, had failed to state a 42 U.S.C. § 1983 claim based on his employer's deprivation of his property interest in his employment in violation of the Fourteenth Amendment. *Ferraro*, 23 F.3d at 806. Significantly, in so holding, the court explained:

> [W]e do not determine whether an adverse employment action not alleged to have constituted a constructive discharge of an employee can ever give rise to a section 1983 action. Rather, we hold only that [plaintiff] does not state a claim upon which relief may be granted, as he concedes that he was not discharged actually or constructively, his salary and benefits were not affected adversely by the appellees' actions, the appellee did not strip him of his job title, and he was not transferred to a different agency of the municipal government.

*Id*. at 807. *See also Bridges v. Commsr. Soc. Sec.*, -- Fed. Appx. --, 2016 WL 7010883 at *5 (3d Cir. Dec. 1, 2016) (affirming dismissal of procedural due process claim in part on the basis that "[t]hough it is clear that a public employee can have a property interest in his employment, [plaintiff] did not have a property interest in his designation as a [Hearing Office Chief Administrative Law Judge]. After all, when he lost that designation he did not lose his position as an ALJ and he did not lose any salary or other benefits."); *id.* ("we recognize that titles can have value and therefore the loss of a title can be a loss of a property interest,").

Also providing guidance is the court's decision in *Strong v. Grambling State Univ.*, 159 F.Supp3d 697 (W.D. La. 2015), where the plaintiff, a tenured professor, had brought a number of claims against his university employer, including a 42 U.S.C. §1983 claim that the university violated his procedural due process rights when it reduced his salary without providing him a hearing. The *Strong* court granted defendant's motion for summary judgment on the §1983 claim, reasoning that adequate process had been provided (and not on the basis that plaintiff did not have a protected property interest in his salary):

> Strong's bare suggestion that he was denied procedural due process when his salary was reduced without a hearing is likewise meritless. State universities enjoy a large degree of discretion in setting their employees' salaries, including the salaries of tenured professors. Williams v. Tex. Tech Univ. Health Sci. Ctr., 6 F.3d 290, 292–93 (5th Cir.1993). The Fifth Circuit has made clear that a hearing is not automatically required before any reduction of a tenured professor's salary. *Id*. Rather, the minimum process required is "notice of the reasons for a proposed deprivation and some opportunity to respond to the substance of the allegations before a final deprivation occurs." *Id*. Here, Strong was given notice of the salary reduction and had an opportunity to file an administrative grievance, which he in fact did. [Doc. # 84, p. 1]. No further process was required under these facts.

*Strong*, 159 F. Supp. 3d at 712–13. *See also Lewis v. Washington State Univ.*, No. CV-12-475-RHW, 2013 WL 1858604, at *6 (E.D. Wash. May 2, 2013) ("Defendants assert that case law limits the scope of a tenured professor's property right to tenure and pay."); *Ashfaq v. Anderson*, 603 F. Supp. 2d 936, 942 (N.D. Tex. 2009) (explaining "[a]s the Fifth Circuit has recognized on more than one occasion, physicians employed by the state hold a property interest in the economic benefits of their employment, but not to non-economic benefits"). *Cf. Vatner v. Bd. of Trustees of the Univ. of Med.*, 2015 WL 461901 at *9 (D.N.J. Feb. 4, 2015) (holding "[t]o the extent Plaintiff's procedural due process claim is premised on the reduction of his tenured salary, Plaintiff cites to no binding legal authority in support of the theory that his property interest in the entirety of his tenured salary was constitutionally protected. As such, the Court concludes that Plaintiff has failed to meet his burden of establishing that his property interest in the entirety of his tenured salary was constitutionally protected.").

Ultimately, and contrary to Defendant's position, the Court concludes that the expectation of employment to which Dr. McKinney is entitled as a tenured professor includes a property interest in the entirety of the salary that accompanies his tenured position. Accordingly, Defendant's motion for summary judgment cannot be granted based upon its contention that Plaintiff lacks a property interest in any set salary for his tenured faculty appointment. The

Court's next query, thus, is whether Plaintiff was afforded procedural due process by the University with respect to this salary reduction.

### 2. Whether the University provided Dr. McKinney with procedural due process when it reduced his salary.

In further support of its motion for summary judgment, the University contends that it "afforded Dr. McKinney notice and an opportunity to be heard via prior warnings, an extensive explanation of the decision, and a means to appeal and/or grieve the salary reduction." (Docket No. 21 at 19). To the contrary, in support of his motion for summary judgment, Dr. McKinney argues that he "was not granted due process, either before or after his salary reduction." (Docket No. 25 at 13).

This Court explained in *Burns v. Alexander*, 776 F.Supp.2d 57 (W.D. Pa. 2011):

> Once it is determined that the Due Process Clause is implicated by a specific deprivation of liberty or property, the relevant question becomes what process is due under the particular circumstances "The Fourteenth Amendment does not protect against all deprivations of liberty [or property]. It protects only against deprivations of liberty [or property] accomplished without due process of law.'" "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." "The standard for determining what process is due in a given situation is rather flexible, since the due process inquiry eschews reliance on rigid mandates in favor of an approach which accounts for the factual circumstances of the particular situation at issue." The determination as to what the Due Process Clause requires under these circumstances is governed by the general standard set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews*, the Supreme Court explained:

>> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

"These factors determine the appropriate level of process' required in order for a deprivation' of liberty or property to be in accordance with the Due Process Clause." Once the "appropriate level of process" has been identified, "the right to procedural due process is absolute' in the sense that it does not depend upon the merits of [an individual's] substantive assertions."

*Burns,* 776 F. Supp.2d at 83–84 (citations omitted).

Focusing on the due process to which one with a protected liberty or property interest is entitled pre-deprivation, in *Montanez v. Sec. Pa. Dept. of Corr.*, 773 F.3d 472 (3d Cir. 2014), the appellate court explained:

As a default matter, "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon v. Burch*, 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Thus, where the pre-deprivation safeguards "would be of use in preventing the kind of deprivation alleged," the state must provide such a hearing. *Id*. at 139, 110 S.Ct. 975.  . . .

Where pre-deprivation process is not feasible, this default rule does not apply. Thus, in the "unusual case" where "the value of predeprivation safeguards ... is negligible in preventing the kind of deprivation at issue," the state is not constitutionally required to provide any predeprivation process. *Zinermon*, 494 U.S. at 129, 110 S.Ct. 975. Following this rule, we have held that assessments against inmate accounts to defray the costs of medical treatment, *Reynolds*, 128 F.3d 166, or the application of a fixed fee to defray the costs of room and board, *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410 (3d Cir.2000), present the types of situations where pre-deprivation hearings are impractical or would be meaningless. Most pertinently, the court in *Tillman* reasoned that a program involving "routine matters of accounting, with a low risk of error," requires no predeprivation process. *Id*. at 422.

Taken together, these cases make clear that when pre-deprivation process could be effective in preventing errors, that process is required. *See Burns*, 642 F.3d 163; Higgins, 293 F.3d at 693–94.

*Montanez*, 773 F.3d at 483-84.

Applying the *Mathews* factors to the matter at hand, first the private interest affected by the official action, Dr. McKinney's interest in twenty percent (20%) of his salary, is significant given that it is a permanent reduction in salary and affects Plaintiff's livelihood, but it is not as

substantial as if he were being completely deprived of his livelihood. *See Espinosa v. County of Union*, 212 Fed App'x 146, 155 (3d Cir. 2007) (citing *Gilbert v. Homar*, 520 U.S. at 932) ("'lost income is relatively insubstantial' as compared to the 'severity of depriving someone of the means of his livelihood.' " *Bruno v. Supreme Ct. of Pa.*, 946 F.Supp.2d 392, 400 (E.D. Pa. 2013) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 932 (1976)) ("The private interest depends upon both 'the length' and 'finality of the deprivation'.").

Second, as to "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards," the Court finds that given that Dr. McKinney's salary was reduced as of September 1, 2013, and yet he was not told of the reduction, the factors that led to the reduction, or given the opportunity to respond to Dean Keeler's evaluation of Plaintiff's performance until September 6, 2013, i.e. post-deprivation, this factor weighs in favor of Plaintiff. Certainly if Plaintiff had been informed of Dean Keeler's evaluation of Dr. McKinney's job performance, and afforded, pre-deprivation, the opportunity to present his version of the story, including any supporting evidence, the risk of erroneous deprivation would be greatly reduced.

Finally, the University has a significant interest in maintaining the quality of the education provided by its faculty, and disciplining faculty, including tenured faculty, whose performance has been found to be unsatisfactory. *See Chung v. Park*, 514 F.2d 382, 387 (3d Cir. 1975) ("[T]he administration of the internal affairs of a college and especially the determination of professional competency is a matter peculiarly within the discretion of a college administration"); *Williams*, 6 F.3d at 293 (citations omitted) ("A state university has a significant interest in having reasonable discretion to administer its educational programs."). It would not, however, be fiscally or administratively burdensome to provide a tenured faculty member with

the bases for a reduction in salary and an opportunity to present his version of the story prior to reducing the professor's salary. The reduction of a tenured university's professor's salary for poor performance does not constitute the type of extraordinary circumstances whereupon pre-deprivation process is not feasible or otherwise would be of negligible value. See *Schmidt v. Creedon*, 639 F3d. 587, 589-59 (3d Cir. 2011) (court held that, "absent extraordinary circumstances," some form of pre-deprivation proceeding, albeit "brief and informal," was necessary before suspending a police officer from a position in which he had a property interest, even if constitutionally adequate post-deprivation proceedings are available). *See also Russell v. Harrison*, 736 F.2d 283, 290 (5th Cir. 1984) (appellate court reversed district court's order granting summary judgment in favor of defendant universities where plaintiffs, former employees, were not afforded any opportunity for a hearing before their one-year contracts of employment were terminated for financial reasons). Indeed, the decision to reduce Dr. McKinney's salary effective September 1, 2013 had been made by early August 2013. (Docket No. 27-13 at 1).

Having considered all of the *Mathews* factors, the Court concludes that under the facts of this case, Dr. McKinney was entitled to notice and an opportunity to be heard prior to the University reducing his salary by twenty percent (20%), as well as a post-deprivation hearing. Having so held, turning to the facts of record relevant to the notice received by Dr. McKinney, the Court finds that even viewing the evidence of record in a light most favorable to Dr. McKinney, there are no genuine issues of material fact with respect to the adequacy of the notice received by Dr. McKinney concerning his salary reduction and a reasonable fact finder could only conclude that prior to depriving Plaintiff of twenty percent (20%) of his salary, the University provided Dr. McKinney with adequate notice. "Notice is sufficient, 1) if it apprises

the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." *Gniotek v. City of Philadelphia*, 808 F.2d 241, 244 (3d Cir.1986) (*citing Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487). Specifically, it is undisputed that as early as August 2012, Dr. McKinney was given written notice by Dean Keeler, his supervisor, that based on Dean Keeler's evaluation of Dr. McKinney's job performance in a variety of categories, Dr. McKinney was at risk in the following academic year of either not receiving a salary increase or receiving a salary reduction unless Dr. McKinney improved his job performance in a number of specific ways. Indeed "Plaintiff acknowledge[d] that he received notice of the possibility of a salary reduction." (Docket No. 35 at 4). More importantly, it is further undisputed that on September 6, 2013, Dean Keeler met with Plaintiff, gave Dr. McKinney the August 3, 2013 letter that informed him that as a result of his unsatisfactory job performance, effective September 1, 2013, Dr. McKinney's salary for the academic year 2013-2014 was being reduced by twenty percent (20%), and explained in detail the specific bases for the salary reduction, i.e. that Dean Keeler had concluded that Dr. McKinney had failed to make the specific improvements as so instructed in Dean Keeler's 2012 letter and that additionally, Dean Keeler opined that Plaintiff had been inaccurately reporting the progress of his research. (Docket No. 27-13).

The Court further finds, however, that while it cannot be disputed that Dr. McKinney was given adequate notice of the charges against him that had led to his salary being reduced, even viewing the evidence of record in a light most favorable to the University, there is no evidence in the record from which a reasonable fact finder could conclude that the University provided Dr. McKinney with an adequate pre-deprivation opportunity to be heard prior to depriving him of his property interest in his full salary on September 1, 2013. Specifically, it is undisputed that Dr.

McKinney was not informed until September 6, 2013, that effective September 1, 2013, his salary had been reduced by twenty percent (20%). (Docket Nos. 22 at ¶ 64, 23-6 at 24). Therefore, by the time Plaintiff was given notice of the deprivation, the deprivation had already occurred.[2] Such conduct by the University, the failure to provide Dr. McKinney with any pre-deprivation opportunity to be heard prior to reducing his salary, violated Plaintiff's right to procedural due process. *See Burns*, 776 F. Supp. 2d at 84–85 (citing *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir.2008) ("Where a pre-deprivation hearing is constitutionally required but not provided, no amount of post-deprivation process is adequate to satisfy the demands of the Due Process Clause."). *See also Vatner,* 2015 WL 461901, at * 12 (denying defendant's motion for summary judgment where there were "genuine issues of material fact in dispute as to whether Plaintiff received advance notice before his unpaid suspension went into effect and/or had a meaningful opportunity to be heard before it went into effect."). Accordingly, Defendant's motion for summary judgment on Plaintiff's procedural due process claim must be denied, and Plaintiff's motion for summary judgment on his procedural due process claim must be granted.[3]

---

[2]Had Defendant not reduced Plaintiff's salary prior to the September 6, 2013 meeting, and instead announced its intent to reduce Dr. McKinney's salary forthwith at the conclusion of the September 6, 2013 meeting, this case, in terms of the pre-deprivation due process analysis, would have been analogous to *Copeland v. Phila. Police Dept.*, 840 F.2d 1139 (3d Cir. 1988) and *Gniotek, v. City of Philadelphia*, 808 F.2d 241 (3d Cir.1986), wherein the appellate court concluded that the plaintiffs-employees had not been denied procedural due process pre-deprivation when the defendants-employers did not inform the employee of the employer's intent to suspend the employee with intent to dismiss until the conclusion of the hearings on the underlying charges. *Copeland*, 840 F.2d at 1145; *Gniotek*, 808 F.2d at 242.

[3] In light of the Court's conclusion that Plaintiff is entitled to summary judgment on his procedural due process claim based on Defendant's failure to provide Plaintiff with sufficient due process pre-derivation, it is not necessary for the Court to address the parties' arguments with respect to whether Dr. McKinney was afforded due process post-deprivation, and therefore, the Court elects not to do so.

**V. Conclusion.**

For the foregoing reasons, Plaintiff Jerome McKinney's motion for summary judgment (Docket No. 24) shall be granted as to Count II of Plaintiff's Complaint, and Defendant University of Pittsburgh's motion for summary judgment (Docket No. 20) shall granted as to Count I of the Complaint and be denied as to Count II of the Complaint.

An appropriate Order follows.


June 5, 2017

By the Court:

<u>s/Nora Barry Fischer</u>
Nora Barry Fischer
United States District Judge
